# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| MARY JOHN SPENCER | : |
| | : |
| | :  Civil Action No: |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| NATIONAL CITY MORTGAGE, | : |
| d/b/a PNC MORTGAGE | : |
| | : |
| Defendant. | : |

## COMPLAINT

**COMES NOW,** the Plaintiff, by and through counsel, in the above styled case and for the Complaint against the Defendant, National City Mortgage, d/b/a PNC Mortgage

### JURISDICTION AND VENUE

1. This is an action brought by a consumer for violations of the Fair Credit Reporting Act (15 U.S.C. § 1681 et. seq. (hereinafter "FCRA") regarding inaccurate and false entries on Plaintiff's credit reports. Therefore, subject matter jurisdiction exists under 28 U.S.C. Section 1331.

1

2. Plaintiff is a natural person who resides within the Northern Division of this District.

3. National City Mortgage, d/b/a PNC Mortgage (hereinafter "NCM d/b/a PNC Mortgage") is a foreign company with its headquarters in 249 Fifth Avenue, One PNC Plaza, Pittsburgh, PA 15222 and engages in Georgia. PNC Mortgage is a division of PNC Bank, N.A.

## STATEMENT OF FACTS

4. On or around April 15, 2007, Plaintiff obtained a loan for $117,000 from NCM d/b/a PNC Mortgage for improvements on her home.

5. The loan was secured with Plaintiff's home 9265 Riverclub Parkway, Duluth, Georgia 30097.

6. Plaintiff was notified shortly after the closing by the closing attorney and NCM d/b/a PNC that the original executed loan documents were lost. Either NCM d/b/a PNC never received the original loan documents from the closing attorney or NCM d/b/a PNC misfiled the documents.

7. Plaintiff, however, made all mortgage payments as requested by NCM d/b/a PNC and the closing attorney.

8. Despite making timely monthly mortgage payments on the loan, Plaintiff received late and delinquent notices starting in June of 2007 and continued to receive them thereafter.

9. Plaintiff gave NCM d/b/a PNC all the check numbers and date of each monthly payment. However, NCM d/b/a PNC stated that they were holding their account in suspense until their account was properly set up due to loss of the loan documents and despite cashing each and every monthly payment made by Plaintiff.

10. Around August of 2007 Plaintiff was notified by her bank that NCM d/b/a PNC was reporting delinquent payments on their mortgage. Shortly thereafter, American Express also notified Plaintiff of the negative credit reporting by NCM d/b/a PNC.

11. Plaintiff sent NCM d/b/a PNC again copies of the checks evidencing the monthly mortgage payments she had made.

12. When Plaintiff notified NCM d/b/a PNC repeatedly of the false reporting to the credit bureaus and demanding correction, NCM d/b/a PNC refused to acknowledge their mistake and refused to fix their erroneous credit reporting.

13. In addition, after the closing of the loan and after Plaintiff started the improvements on the home, NCM d/b/a PNC hiked up the agreed upon interest rate because of alleged mold problems.

14. Plaintiff proved there was no mold.

15. In February of 2008, Plaintiff sued NCM d/b/a PNC for hiking the interest rate, false reporting to credit bureaus, and reimbursement for unnecessary mold inspections, fees for flood insurance, and other miscellaneous fees that Plaintiff incurred as a result of NCM d/b/a PNC's mistakes.

16. In September of 2008 NCM d/b/a PNC agreed to a loan modification to compensate Plaintiffs for their mistakes in exchange for dismissing the lawsuit.

17. The loan modification document was executed in September 2008 at the Atlanta law offices of McLain and Merritt and the lawsuit was dismissed by Plaintiff.

18. After the loan modification was executed and the lawsuit dismissed, NCM d/b/a PNC again lost the original loan modification document and Plaintiff discovered that NCM d/b/a PNC was still holding their account in suspense and continuing to report delinquent payments.

19. Again, Plaintiff had to repeatedly call NCM d/b/a PNC demanding to stop sending delinquent notices when she had been making monthly mortgage payments according to the terms of the loan modification agreement.

20. Plaintiff has demanded to NCM d/b/a PNC to stop the false reporting of delinquent payments as her business depended on her credit rating.

21. In addition, the false negative credit reporting was not corrected and NCM d/b/a PNC continued to report late and delinquent payments to the credit bureaus.

22. The week before Christmas in December of 2008, Plaintiff was in Las Vegas for a trade show for her business, Safari House, LLC d/b/a Event Solutions.

23. In the middle of installing several trade show booths, Plaintiff received an emergency call from their operations director stating that the American Express Card issued in Plaintiff's name was declined when they attempted to purchase items necessary for the booths. As a result, Plaintiffs had to expend additional resources, costs, and expenses that but for NCM d/b/a PNC's false negative credit reporting.

24. When Plaintiff returned from Las Vegas, American Express stated that they declined the use of the credit card because NCM d/b/a PNC reported delinquent mortgage payments.

25. Plaintiff's line of credit was reduced from $120,000 to $10,000.

26. As a result of American Express declining the use of Plaintiff's credit card, employees were stranded in Las Vegas without the ability to use the credit card for travel expenses, entertaining clients, paying labor contractors, carpeting and padding the booths, and other necessities to prepare for the January 2009 "Builders Show."

27. In addition, Plaintiff had no way of fixing the problem with American Express because the card was shut down during the weekend. Thus, Plaintiff and her employees had to beg and scrape from customers and suppliers for additional funds to complete the set up of the booths, thereby damaging Plaintiff and her business' credibility, especially amongst her clients, labor contractors, suppliers, and employees.

28. On January 29, 2009 NCM d/b/a PNC sent another apology letter to Plaintiff but forwarded the apology letter to only two of the credit bureaus. However, NCM d/b/a PNC again failed to correct their mistakes with all the credit bureaus.

29. For the next four months, Plaintiff sent proof of her mortgage payments to NCM d/b/a PNC and her financials almost daily to American Express explaining NCM d/b/a PNC's reporting errors.

30. However, American Express declined to reinstate the original credit line due to the reporting of delinquent home payments that were not fixed on Plaintiff's credit report.

31. Plaintiff suffered severe hardship of juggling financing for clients and suppliers due to her American Express reduced credit line. Due to the financial hardship that would not have occurred but for NCM's false credit reporting, Plaintiff sought refinancing from NCM d/b/a PNC. Otherwise, Plaintiff would have no choice but to sue again for damages.

32. Plaintiff spoke to numerous individuals from loss mitigation department, including Jennifer Mufflin, Sarah Greggerson, Loretta Dunkman, and Tiona Hill.

33. After two weeks, Sarah Greggerson called Plaintiff with a forbearance agreement for four months while the new refinancing agreement with discount of 3-4% interest rate was finalized.

34. Forbearance agreement was signed around September 20, 2009 for both the primary and secondary loan with NCM d/b/a PNC providing for one combined mortgage payment to cover both loans until the refinancing agreement was finalized.

35. Sara Greggerson from NCM d/b/a PNC sent a letter to Plaintiff stating that the forbearance agreement was in place and stated that she appreciated

Plaintiff's suggestion to pay $676 per month to ensure the escrow account would not be short before the re-financing.

36. Plaintiff also received from Ms. Greggerson from NCM d/b/a PNC instructions and the payment amount for the five month forbearance period, which began in November of 2009.

37. Plaintiff was told by NCM d/b/a PNC representatives that they would get the refinancing and the paper-work just needed to be finalized.

38. However, during the forbearance period NCM d/b/a PNC continued to report delinquent payments on the $117,000 loan, despite the agreement not to report delinquent payments pursuant to the forbearance agreement that covered both loans.

39. When Ms. Greggerson was notified by Plaintiff of the error by NCM d/b/a PNC, she corrected NCM d/b/a PNC's paperwork and issued an apology letter. NCM d/b/a PNC erroneously listed only one of the loans for forbearance even though the agreement was for both loans.

40. On December 10, 2009, NCM d/b/a PNC apologized yet again to Plaintiff for their false credit reporting. However, the false negative reporting was not corrected and continued thereafter.

41. In March of 2010, Tiona Hill who took over Plaintiff's account notified Plaintiff that NCM d/b/a PNC recommended Plaintiff to extend the forbearance for an additional month to finalize the re-financing. Ms. Hill informed Plaintiff that their department was far behind in refinancing and she asked Plaintiff if she could continue the forbearance and still continue to make $676 escrow payment.

42. Plaintiff agreed to extend the forbearance after Ms. Hill assured Plaintiff that there was going to be no other problems with refinancing, other than the interest rate would have to be their current offering rate, which was guaranteed to be around 3-4%.

43. The next month Tiona Hill called back notifying Plaintiff that NCM d/b/a PNC changed their mind would not give them the agreed upon refinancing due to alleged moratorium on re-financing.

44. Plaintiff suffered approximately $116,997 as a result of NCM d/b/a's false negative reporting to the credit bureaus and damages are continuing to accrue, not including attorney fees and court costs.

## CLAIM OF RELIEF

### Federal Credit Reporting Act

45. All paragraphs of this Complaint are expressly adopted and incorporated as if fully set forth therein.

46. Plaintiff is a consumer as codified at 15 U.S.C. § 1681a(c).

47. Defendant is an entity who, regularly and in the course of business, furnishes information to one or more of Credit Reporting Agencies (hereinafter "CRAs") about its transactions or experiences with any consumer and Defendant constitutes a "furnisher" as codified at 15 U.S.C. § 1681s-2.

48. Plaintiff notified CRAs and Defendant directly of a dispute on the Defendant's account's as inaccurate and false as reported by Defendant.

49. All of the CRAs notified Defendant of the dispute.

50. None of the CRAs and Defendant notified Plaintiff that their dispute was frivolous or irrelevant or that they had failed to provide sufficient information to investigate the disputed information. In fact, Defendant apologized for their false reporting and agreed to correct their mistakes but failed to do so.

51. Plaintiff alleges that Defendant failed to fix their false reporting to the credit bureaus.

52. Defendant knew from the multiple correspondences from Plaintiff, CRAs and from their own employees that Plaintiff's account was not delinquent and yet, failed to correct fully and accurately the repeated negative and false reporting.

53. All actions taken by Defendant were done with negligence and were done willfully, recklessly, and/or intentionally, and were done with either the desire to harm Plaintiff and/or with the knowledge that their actions was harming Plaintiff and that their actions were taken in violations of the FCRA.

54. All of the violations of the FCRA proximately caused the injuries and damages of approximately $116,997 as set forth in this Complaint.

## RELIEF SOUGHT

55. An award of statutory, actual, compensatory, and punitive damages, and costs of the action, including expenses, together with reasonable attorney's fees.

56. Plaintiff also requests all further relief to which he is entitled, whether of a legal or equitable nature.

57. Trial by Jury

Respectfully Submitted,

/s/ Holly Geerdes

Holly Geerdes, Esq.-Attorney for Plaintiff